IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02926-MEH

HESHIMO YAPHET CARR,

    Plaintiff,

v.

EL PASO COUNTY, COLORADO,
C. CABLE, in individual and official capacities, and
CORPUZ, in individual and official capacities,

    Defendants.

---

**ORDER**

---

**Michael E. Hegarty, United States Magistrate Judge.**

    This action arises out of the incarceration of Plaintiff Heshimo Carr ("Carr") as a pretrial detainee at the Criminal Justice Center of El Paso County, Colorado (the "CJC"). Carr's Third Amended Complaint ("Complaint") brings three claims pursuant to 42 U.S.C. § 1983: (1) excessive force in violation of the Fourteenth Amendment against Defendant Corpuz; (2) excessive force in violation of the Fourteenth Amendment against Defendant Cable; and (3) municipal liability against El Paso County. In response, Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, Defendants' Motion to Dismiss the Third Amended Complaint [filed October 15, 2018; ECF No. 60] is granted in part and denied in part.

**BACKGROUND**

    The following are relevant factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Carr in his Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On March 24, 2017, Carr entered the CJC as a pretrial detainee. Compl. 3, ECF No. 59. At the time of his admission, Carr had recently suffered a gunshot wound to his right foot that fractured his second metatarsal bone. *Id*. At all relevant times, Defendants Corpuz and Cable were employed by El Paso County as Deputy Sheriffs serving in the CJC and acting under color of state law. *Id*.

Carr's first claim for relief arises from an incident that occurred on or about May 18, 2017. Carr alleges that, at approximately 7:40 p.m., Deputy Corpuz was sitting at the staff table at the front of the Bravo Unit, Pod 3 at the CJC. *Id.* at 4. Carr approached Corpuz to request assistance either to obtain an item or to call the medical staff regarding his broken foot. Corpuz refused and when Carr complained about the refusal, Corpuz ordered Carr to "lock down" in his cell. Carr turned around and began walking to his cell. Corpuz followed very closely behind Carr, essentially "marshaling him" toward his cell, although Carr was already heading in the direction of his cell. Without turning his body, Carr turned his head to ask why Corpuz was following him and walking so fast, noting that he was injured, in a medical boot, and unable to walk as fast as Corpuz. At no time did Carr threaten Corpuz or otherwise disturb the orderly functioning of the CJC. *Id*.

Carr alleges that suddenly and without provocation or warning, Corpuz reached out with both hands and violently shoved Carr in the small of the back. Given the suddenness and force of the shove, combined with Carr's unsteadiness from his foot injury, Carr lost his balance and struck the wall. The impact with the wall cut and scraped Carr's right arm, which started to bleed at the elbow. Unable to regain his balance after being shoved, Carr stumbled into the nearest cell (which was not his own), banging his body against the doorframe. Corpuz slammed the cell door and locked Carr inside. Witnesses to the incident yelled at Corpuz, complaining that his treatment of Carr was improper and unfair. In response, Corpuz ordered everyone in the pod to lock down. Corpuz then summoned assistance by pushing an emergency button. The sergeant on duty responded to Pod 3

2

and removed Corpuz from duty. Carr claims that, as a result of Corpuz's shove, he suffered injuries and pain to his right arm, neck, back, and foot, as well as emotional distress, anxiety, and fear of authority. Carr filed a grievance against Corpuz regarding the incident but was told by a lieutenant that the grievance would not be addressed. *Id.* 4-5.

Carr's second claim for relief arises from an incident that occurred on or about September 12, 2017. Carr alleges that, at approximately 2:30 a.m., he was asleep in his cell when Deputy Cable opened the cell door and yelled for Carr to remove a sheet that Carr had placed alongside his bunk as a curtain. *Id*. 6. Carr immediately pulled down the sheet and stood up out of bed. Cable and a second unknown deputy entered Carr's cell and advanced toward him. Carr was confused and disoriented, as he had just been awakened and was groggy from medications that can cause dizziness or drowsiness. Carr did not understand why Cable continued to advance on him after he had followed Cable's directive to take down the sheet, so asked what else he wanted; Cable responded by asking Carr, "What's your attitude for?" Carr was confused and responded, "What attitude?" Cable ordered Carr to sit down on the bed, but without giving Carr an opportunity to do so, Cable told Carr, "this is not going to be pretty for you, Carr; this is not going to end well for you." At no time did Cable order Carr to "cuff up."

Instead, Cable raised his fists and advanced toward Carr. Carr asked, "What are you talking about?" Carr contends that Cable then turned to the unknown deputy, asked "[a]re you ready for this?," and began punching Carr. According to the Complaint, Cable punched Carr in the head three to four times; one of the blows swelled the area around Carr's eye and the bridge of his nose. Cable also punched Carr three to four times in the abdomen. Carr did not fight back, but tried to hug Cable in an attempt to keep Cable from punching him further. Someone nearby must have called for help, because Deputy Coffee arrived, entered Carr's cell, grabbed Cable's arm, and told him to "get out

3

of here." Cable left the cell, and Coffee asked Carr if he was okay. Carr offered to "cuff up" for Coffee and turned around while Coffee applied handcuffs. Coffee then took Carr to the "cool-off" cell. Carr believes the medical staff examined him while he was in the cool-off cell and may have photographed his face and swollen eye. As a result of Cable's punches, Carr suffered injuries to his face and abdomen, neck pain, emotional distress, anxiety, insomnia, and fear that his life was in danger even while asleep. *Id*. 6-7.

Carr brings his third claim for relief against El Paso County for municipal liability. Carr alleges that, as recently as July 2018, El Paso County paid $675,000 to a former inmate to settle her civil rights claims, including claims of excessive force, after deputies slammed her face-first on a cell floor, causing her to suffer a torn ACL, broken knee, and other injuries. *Id*. 8 (citing *McCully v. El Paso County, el al.*, Case No. 16-cv-00867-WJM-MEH (D. Colo., May 2, 2016)). A formal investigation in that case revealed that from 2012 to 2016, certain El Paso County deputies participated in a "rankings competition" for use of force on inmates at the CJC, many of whom were pretrial detainees who had not been convicted of any crime. Even though a whistleblower deputy reported the deputies' behavior to his superiors on more than one occasion, no action was taken until late April 2016. Plaintiff alleges that this history of disciplinary actions, the lawsuit, and the subsequent settlement, which involved allegations of law enforcement excessive force at CJC, evidence a culture and custom of excessive use of force within the El Paso County Sheriff's Office and demonstrate that El Paso County and the El Paso County Sheriff's Office created, maintained, and tolerated a culture, custom, and policy of law enforcement officers using excessive force against pretrial detainees at the CJC in violation of Carr's constitutional rights.

## LEGAL STANDARDS

I. **Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff

has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## II.  Qualified Immunity

The individual Defendants base their request for dismissal on the doctrine of qualified immunity, which protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is an immunity from suit, rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. *Id.* at 231; *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) ("The privilege is an immunity from suit rather than a mere defense to liability."). The "driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government

officials will be resolved prior to discovery." *Pearson*, 555 U.S. at 231-232 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, n.2 (1987)). Accordingly, qualified immunity questions must be resolved at the earliest possible stage in litigation." *Id.* at 232.

When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). Traditionally, there has been a two-step process for resolving qualified immunity questions: "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right. . . . Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194 (2001) (internal citations and quotation marks removed)). The Supreme Court affords courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009). An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

## ANALYSIS

**I.     Does Carr Plausibly Allege Excessive Force Against Deputy Corpuz?**

The Fourteenth Amendment to the United States Constitution states in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

7

U. S. Const. amend. XIX. In this context, the due process clause of the Fourteenth Amendment "protects a pretrial detainee from the excessive use of force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). In 1989, the Supreme Court concluded that the Fourteenth Amendment "protects a pretrial detainee from the excessive use of force that amounts to punishment." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). Thus, at the time Deputy Corpuz was a prison guard in 2017, the law was clearly established that the Fourteenth Amendment protected Carr, a pretrial detainee, against an excessive use of force amounting to punishment. *See id.* Carr has established one element necessary to overcome qualified immunity; I must now determine whether Carr has plausibly alleged a violation of the Fourteenth Amendment.

To prevail on an excessive force claim, a pretrial detainee must plausibly allege that (1) the defendant possessed a purposeful, knowing, or a reckless state of mind (i.e., the conduct was not accidental); and (2) the defendant's actions were objectively unreasonable in light of the facts and circumstances of the particular case. *See id.* at 2472-73. The use of force is not objectively reasonable if it is not "rationally related to a legitimate governmental objective." *Id*. at 2473-74. Courts judge the reasonableness of the force used from the perspective of a reasonable officer, based on the information known to the officer at the time. *Id*. at 2472. Courts also consider the "legitimate interests in managing a jail," giving deference to policies and practices needed to maintain internal order, discipline, and institutional security. *Id*. at 2474; *Eaves v. El Paso Cty. Bd. of Cty. Comm'rs,* No. 16-cv-01065-KLM, 2017 WL 1243013, at *7 (D. Colo. Mar. 24, 2017).

In *Kingsley*, the Supreme Court identified considerations that may be relevant to determining the reasonableness of the force used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat

8

reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Kingsley*, 135 S. Ct. at 2473.

Taking the facts alleged in the Complaint as true, *Iqbal*, 556 U.S. at 678 , I find that Carr plausibly alleges a claim for violation of the Fourteenth Amendment. Carr asserts that after Corpuz refused a simple request, Carr verbalized a complaint about the refusal and Corpuz ordered Carr to "lock down." Carr alleges that he complied and walked toward his cell, but Corpuz walked closely and quickly behind him essentially "marshaling him" toward his cell. Then, without turning toward or threatening Corpuz, and without disturbing the orderly functioning of the facility, Carr voiced a concern about Corpuz's speed in light of Carr's injured foot. Carr contends that Corpuz shoved him in the back causing him to lose his balance, fall against a wall, stumble into a cell, and hit the cell's door frame. Compl. 4-5. I find these allegations plausibly allege that Corpuz purposefully shoved Carr, which purportedly caused Carr's injuries.

I must now determine whether Corpuz's action in shoving Carr was objectively reasonable under the circumstances. In the present motion, Corpuz argues that shoving Carr was justified by Carr's "turning to confront a deputy after being ordered to 'lock down.'" Mot. 7. The Court, however, must take Carr's factual allegations as true and, thus, any dispute of fact may not serve as a basis for demonstrating the insufficiency of a pleading.

Corpuz also argues that "[s]ecurity and discipline needs unique to jails are illustrated by plaintiff's own allegations that other inmates 'began yelling at Corpuz, complaining that his treatment of Carr was improper and unfair.'" Mot. 8. However, Corpuz's argument here is temporally strained, putting the figurative cart before the horse: Corpuz cannot successfully rationalize that the *result* of his shoving Carr justified the shove.

Finally, Corpuz argues that the force allegedly used against Carr was "de minimis" and,

9

therefore, not excessive. Corpuz relies primarily on cases addressing whether prison guards violated prisoners' Eighth Amendment rights against cruel and unusual punishment. Mot. 7-9.[1] His reliance on those cases is misplaced; in Eighth Amendment excessive force cases, the plaintiff must plausibly allege that a defendant acted "maliciously and sadistically to cause harm" rather than "in a good faith effort to maintain or restore discipline." *See Norton v. City of Marietta*, 432 F.3d 1145, 1154 (10th Cir. 2005); *Pena v. Greffet*, 108 F. Supp. 3d 1030, 1051, 1055 (D. N.M. 2015). The Supreme Court has distinguished Eighth Amendment claims, involving convicted inmates, from Fourteenth Amendment claims, involving pretrial detainees, saying "[t]he language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley*, 135 S. Ct. at 2475. Therefore, I am not persuaded by Corpuz's reliance on Eighth Amendment cases to attempt to invalidate Carr's allegations that he was a pretrial detainee at the time of the incident and Corpuz violated the Fourteenth Amendment when he shoved Carr; according to the Supreme Court, Carr's allegations are judged by a different standard than allegations supporting an Eighth Amendment claim. *See id.* ("there is no need here, as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional.").

I conclude that Carr's allegations, taken as true, demonstrate Corpuz's action in shoving Carr

---

[1] Notably, Corpuz cites to *Jarrett v. Schubert*, No. 97–2628- GTV, 1998 WL 471992 (D. Kan. July 31, 1998) for the proposition that the plaintiff's allegations "constituted de minimis use of force" where the defendant "'rammed' his elbow and firearm into her chest and 'slammed' and pinned her against the wall of the building, causing her to sustain bruising on her chest." Mot. 8-9. Corpuz is incorrect; the *Jarrett* court found that these very allegations, asserted by Melva Jarrett, 1998 WL 471992 at *1, "create[ ] a genuine issue of material fact whether Schubert violated her Fourteenth Amendment rights," "the evidence suggests that Schubert assaulted her without provocation," and "[t]he bruising that she suffered from his attack is more than a de minimis injury." *Id.* at *6.

was objectively unreasonable under the particular circumstances. Because the law prohibiting excessive force against pretrial detainees was clearly established, Corpuz knew or should have known that Carr was protected from excessive force by the Fourteenth Amendment. *Kingsley,* 135 S. Ct. at 2473. He was also aware Carr had a foot injury and was complying with the "lock down" order by returning to his cell as fast as he could walk. Because Corpuz was following closely behind Carr, Carr turned his head to complain that Corpuz was walking too fast. Nothing about this factual scenario would lead a reasonable prison guard in Corpuz's position to think that shoving Carr in response to his complaint was reasonable or rationally related to a legitimate governmental objective. *See id.* at 2473-74. Accordingly, Carr has alleged facts that plausibly state a claim of excessive force in violation of the Fourteenth Amendment against Deputy Corpuz.

## II.     Does Carr Plausibly Allege Excessive Force Against Deputy Cable?

As set forth above, the law prohibiting excessive force against pretrial detainees was clearly established in 2017 when Deputy Cable allegedly punched Carr after awakening him in his cell. *See Kingsley,* 135 S. Ct. at 2473. Therefore, I must establish whether Carr plausibly alleges that Cable violated the Fourteenth Amendment.

First, I find that Carr plausibly alleges Cable "possessed a purposeful, knowing, or a reckless state of mind" when he punched Carr. *Id.* at 2472-73. The allegations reflect that Cable ordered Carr to sit down on the bed but, without giving Carr an opportunity to do so, Cable told Carr, "this is not going to be pretty for you, Carr; this is not going to end well for you." Cable raised his fists, advanced toward Carr, then turned to the unknown deputy and asked "[a]re you ready for this?" before he began punching Carr. I find these allegations plausibly state a purposeful state of mind.

Second, I find that Carr plausibly alleges Cable's "actions were objectively unreasonable in light of the facts and circumstances of the particular case." *Kingsley,* 135 S. Ct. at 2473. In his

motion, Cable simply argues that Carr did not follow an order to sit on his bunk and Carr's standing by his bunk "created a safety concern for Defendant Cable, other deputies, and other inmates." Mot. 11. However, taking the allegations as true, the facts demonstrate (1) Carr hung a sheet by his bunk like a curtain; (2) it was 2:30 a.m. and Carr was asleep when Cable entered Carr's cell; (3) as he entered, Cable yelled at Carr to take the sheet down; (4) Carr immediately took down the sheet and stood by his bunk; and (5) Carr was groggy, having been awakened after he took medication that warns of dizziness and drowsiness. Nothing about these facts suggests that Cable or the other unidentified deputy were in any danger. Had they felt threatened by Carr's standing by his bunk, they simply could have closed the cell door or ordered Carr to "cuff up." According to the Complaint, they did neither.

Nothing about the factual scenario alleged by Carr would lead a reasonable prison guard in Cable's position to believe that approaching Carr and punching him repeatedly was reasonable under the circumstances or rationally related to a legitimate governmental objective. *Id*. at 2473-74. Accordingly, Carr has alleged facts that overcome the defense of qualified immunity and plausibly state a claim of excessive force against Deputy Cable.

## III. Municipal Liability Against El Paso County

Defendant El Paso County contends that Carr fails to state sufficient facts to make out a plausible claim for municipal liability. "[M]unicipal defendants . . . can't be held liable under 42 U.S.C. § 1983 solely because they employ a person who violated the plaintiff's constitutional rights." *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 794 (10th Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("[a] municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff.") (quoting *Monell*, 436 U.S. at 692). Hence, local

12

governments can be liable under § 1983 "only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation and citations omitted). To establish a § 1983 claim against a municipality, a plaintiff must "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury" by plausibly alleging (1) the existence of a municipal policy or custom, (2) causation, and (3) state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013); *see also Monell*, 436 U.S. at 690-91, 694 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.").

In establishing the first requirement, a plaintiff may show a municipal policy or custom in the form of any of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions - and the basis for them - of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Brammer-Hoetler v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010)) (internal quotations omitted). "When a policy is not unconstitutional in itself, the county cannot be held liable solely on a showing of a single incident of unconstitutional activity." *Meade v. Grubbs*, 841 F.2d 1512, 1529 (10th Cir. 1988) (citation omitted); *abrogated on other grounds as recognized in Schneider*, 717 F.3d at 767. Consequently, "[w]here a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being

sued." *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009) (citation omitted); *see also Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir.1993) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under [*Monell*] unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

For the second element, Carr must show a "direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). Thus, to establish causation, the plaintiff must assert that the municipality's conduct is "closely related to the ultimate injury." *Harris*, 489 U.S. at 391. To require anything less would subject the municipality to "vicarious liability of the type that Monell rejected." *Martinez v. City & Cty. of Denver*, No. 11–cv–00102–MSK–KLM, 2013 WL 5366980, at *15 (D. Colo. Sept. 25, 2013).

Carr alleges generally that "[t]he culture and custom of excessive use of force within the El Paso County Sheriff's Office is evidenced by a significant history of disciplinary actions, lawsuits, and settlements involving allegations of law enforcement brutality and excessive use of force at the CJC." Mot. 4. The only basis for Carr's argument is information supplied by a newspaper article referenced in both the response brief and Complaint,[2] which discusses a purported "formal investigation" of law enforcement personnel at the CJC and reveals that, during the period 2012-2016, certain deputies kept statistical comparisons on their use of force, bantered about their use-of-

---

[2]Defendants attached a copy of the article to the motion as Exhibit A. In addressing a motion to dismiss under Rule 12(b)(6), a court typically should consider no evidence beyond the pleadings. *See Alvarado v. KOB–TV, L.L.C.*, 493 F.3d 1210, 1216 (10th Cir. 2007). However, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

force rankings, and congratulated each other for using force on inmates and pretrial detainees at the CJC. Mot. Ex. A, ECF No. 60-1. Apparently, as part of the investigation, the El Paso County Sheriff's Office admitted that certain supervisors knew of the deputies' conduct and acknowledged these supervisors' "lapses in judgment" and "failures in this particular matter." *Id.*

El Paso County argues that Carr's third claim should be dismissed because his "limited allegations" of "a single use of force involving a different inmate and different deputies from over three years prior to Plaintiff's allegations" and "a statistic tracking competition involving different deputies that ended the year prior to Plaintiff's allegations . . . fail[ ] to adequately identify an unconstitutional policy or custom." The County also contends Carr "has failed to allege facts establishing that Defendants['] policy would likely cause the injuries complained of by Plaintiff by way of a direct causal link." I agree the claim should be dismissed for Carr's failure to plausibly allege the second "causation" element.

To the extent the use-of-force rankings competition among certain El Paso County deputies (none of whom apparently are named in this case) might be considered to be "an informal custom amounting to a widespread practice that . . . is so permanent and well settled as to constitute a custom or usage with the force of law," *Bryson*, 627 F.3d at 788, no party disputes that the competition occurred during an established time period, from 2012 to 2016. Resp. 13. In fact, the news article reports that "it wasn't until late April 2016 ... that the whistleblower's supervisors finally told him to document his concerns and a formal investigation ensued." ECF No. 60-1 at 3. It is undisputed in this case that the alleged incidents of excessive force occurred in 2017. There is no indication by Carr that these incidents involved the same deputies and/or supervisors as those involved in the rankings competition. Further, the news article states that "[s]upervisors were aware of the rankings to some extent and tried . . . to 'resolve the issue internally' . . . instead of

documenting the transgressions and sending them up the chain of command." Thus, according to information provided by the article, on which Carr bases his claim, the competition occurred during a time period more than a year prior to the alleged incidents here; it was confined to certain supervisors and "deputies on the overnight Intake and Release shift at the jail," none of whom are named here; and, it was not made known to anyone "up the chain of command" until April 2016.

> Carr's argument opposing the motion to dismiss states in its entirety:
>
> How widespread or pervasive a custom or policy is, is directly relevant to establishing municipal liability. *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Further, evidence that a municipality's decision-maker intentionally deprived a plaintiff of a constitutional right, or that an action taken or directed by the municipality violates a constitutional right, is evidence that the action was the moving force behind the alleged injury. *Id.* at 405. Thus, the TAC sufficiently states a claim for municipal liability against El Paso County.

Resp. 13. The Court construes the second sentence,[3] specifically with respect to "the moving force," as a response to El Paso County's causation argument. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1215 (10th Cir. 2003) ("To be liable, the municipality must have had an 'official municipal policy of some nature . . . that was the 'direct cause' or 'moving force' behind the constitutional violations."). However, the Complaint fails to plausibly allege that "a municipality's decision-maker intentionally deprived" Carr of his constitutional rights or that the competition was "taken or directed by" El Paso County. Therefore, the Court is not persuaded and will grant the motion to dismiss the municipal liability claim against El Paso County.

## IV. Punitive Damages

Defendants contend that "Plaintiff alleges *de minimus* injuries resulting from proper uses of

---

[3]The Court construes Carr's first sentence as Carr's attempt to respond to arguments concerning whether the alleged custom satisfies the first element of a municipal liability claim.

force and has not alleged facts supporting his ability to prove the requisite state of mind for punitive damages." Mot. 14. The Court disagrees and, as set forth above, finds the allegations against Defendants Corpuz and Cable plausible and sufficient to withstand scrutiny under Rule 12(b)(6).

## **CONCLUSION**

Taking Carr's allegations as true, the Court concludes that Carr has stated plausible claims of excessive force in violation of the Fourteenth Amendment against Defendants Corpuz and Cable. However, Carr has failed to state a plausible claim for municipal liability against El Paso County. Accordingly, Defendants' Motion to Dismiss the Third Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [filed October 15, 2018; ECF No. 60] is **granted in part and denied in part** as set forth herein. Defendant El Paso County is dismissed from this case.

Dated this the 5th day of March, 2019, in Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge